IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
-------------------------------------------------   :
                                                    : CASE NO.  1:10 cv 00151
ALBERT LEE, JR.,                                    :
                                                    :
                                      Plaintiff,    : OPINION AND ORDER
                                                    :
                  -vs-                              :
                                                    :
                                                    :
LEE LUCAS, et al.,                                  :
                                                    :
                                    Defendants.
-------------------------------------------------
```

UNITED STATES DISTRICT JUDGE LESLEY WELLS

        The plaintiff Albert Lee pled guilty to a drug conspiracy charge in the

multi-defendant case, United States v. Nabors, Case No. 1:05-cr-537. His conviction

and sentence, along with those of the other defendants, were later vacated at the

request of the government.  The decision to vacate came soon after the government's

informant in the case, Jerrell Bray, pled guilty to charges of perjury and deprivation of

civil rights with respect to several defendants in the case, not including Mr. Lee.

Because Mr. Bray was an essential witness in Mr. Lee's case, his illegal conduct so

pervasive, and his credibility so tainted, the government concluded that in the interests

of fairness and justice, it could not stand by Mr. Lee's conviction, despite Mr. Lee's

admissions of guilt and his guilty plea. Defendant Lee Lucas, the DEA agent who led

the charge in the investigation, was later indicted, and ultimately acquitted, on a number

of charges relating to his conduct in the case. Detective Chuck Metcalf, another

investigator in the case, pled guilty to a civil rights misdemeanor in relation to his conduct.

On 21 January 2010, the plaintiff filed this case against the investigators who brought the <u>Nabors</u> case to fruition, and he alleged numerous claims under state and federal law. (Doc. 1). The gist of the plaintiff's complaint was that his constitutional rights were violated when he was "charged, prosecuted, and incarcerated for over two years for crimes he did not commit." (Doc. 1, ¶1). The defendants filed motions to dismiss. On 31 October 2011, the motions were granted in part and denied in part, and the case was ordered to proceed on the plaintiff's Fourth Amendment unlawful detention/malicious prosecution claim, Fifth and Fourteenth Amendment Due Process claims, and applicable conspiracy claims. The defendants now move for summary judgment on those claims based on qualified immunity.

While recognizing serious flaws in the manner in which the investigation proceeded, the Court concludes in this instance that the material facts are not in dispute and that the defendants are entitled to qualified immunity. Therefore, and for the reasons that follow, the defendants' motions are granted.

## I. Background

In January 2005, following a local murder that was believed to be drug related, defendants Detective Chuck Metcalf, Sergeant Matt Mayer, and Captain Larry Faith, of the Richland County Sheriff's Office (RCSO), began investigating drug trafficking in Mansfield, Ohio. (Doc. 1, ¶1). The investigation was called "Operation Turnaround." Beginning in February 2005, the RCSO engaged a paid informant named Jerrell Bray, who had worked with the RCSO prior to Operation Turnaround and had provided what

was believed to be accurate and credible information. (Doc. 67-1, ¶6). Bray participated in four controlled drug buys with the plaintiff Albert Lee, and Bray's services were utilized numerous times with other defendants convicted in the <u>Nabors</u> case.  The typical procedure for each controlled buy involved officers searching Bray and his vehicle in advance, following Bray to the location of the buy, viewing or recording the buy when possible, following Bray from the buy, searching him and his vehicle again, and taking a statement from Bray. (Doc. 67-1, ¶7).

    In early September 2005, a task force of the Drug Enforcement Administration ("DEA") joined Operation Turnaround, and the RCSO presented Bray as a reliable informant. (Tr. 3196).[1]  The task force included defendants Special Agent Lee Lucas, Special Agent Robert Cross, Task Force Officer (TFO) Thomas Verhiley, and Task Force Officer (TFO) Jamal Ansari. Special Agents Lucas and Cross registered Bray as a DEA informant.

    *The Investigation and Prosecution of Albert Lee*

    The first two buys involving Albert Lee were conducted by the RCSO, and the last two jointly by the RCSO and the DEA. The first buy occurred on 25 July 2005, after Sgt. Mayer and Det. Metcalf received a tip from Mr. Bray that someone named "A Lee" was selling crack from a residence on Sturges Ave. in Mansfield, Ohio. (Doc. 93-6). Det. Metcalf and Sgt. Mayer drove past the residence and observed a silver Buick Roadmaster with "fancy wheels," and they recorded the license plate number. <u>Id.</u> Mr.

---

[1]Citations labeled "Tr." refer to testimony from the Lee Lucas trial found at docket entry 91-1.

Bray had informed the officers that this was the vehicle Lee was driving. Id. After running the plate, officers confirmed that the vehicle was registered to Albert Lee, Jr.  Id. A buy was planned, and Mr. Bray placed a controlled call to the individual "A Lee" and made arrangements to purchase crack cocaine at the Sturges residence. Id. Det. Metcalf obtained an image of Mr. Lee's driver's license, which was shown to Mr. Bray prior to the buy. Mr. Bray identified Albert Lee as the individual from whom he anticipated buying crack cocaine. Mr. Bray went to the Sturges residence wearing a monitoring device, and Sgt. Mayer listened. Mr. Bray purchased 7 grams of crack cocaine. Neither Mayer nor Metcalf identified Mr. Lee as the seller in that transaction. (Doc. 93-6). After the transaction, Mr. Bray and his vehicle were searched, and he identified Mr. Lee as the individual who sold him the drugs.

A second buy was planned on 1 August 2005. Mr. Bray placed a call to Albert Lee at the same phone number used in the previous transaction. (Doc. 93-7). Capt. Faith monitored the call, and a meeting was arranged to take place at Lee's residence on Sturges Avenue. (Doc. 67-1, ¶10). Mr. Bray and his vehicle were searched, he was given $300 in buy money, and he was outfitted with a monitoring device. (Doc. 93-7). Sgt. Mayer followed Mr. Bray to the Sturges residence and videotaped Mr. Lee as he arrived. (Doc. 93-7). Capt. Faith listened in on the transaction, and Mr. Bray purchased a quantity of crack cocaine. (Docs. 93-7; 67-1; 67-2). Sgt. Mayer followed Mr. Bray back to the sheriff's office, where he was searched. (Doc. 67-2, ¶10). Mr. Bray produced the crack cocaine and identified "Ailee" as the seller." Id. Both Faith and Mayer state that they did not identify Mr. Lee at that time as the person who had sold drugs to Bray. (Docs. 67-1, ¶10; 67-2, ¶10).

4

After the DEA joined the investigation, a third buy was planned. On 15 September 2005, according to a DEA-6 report, Special Agent Lee Lucas, TFO Verhiley, TFO Ansari, Special Agent Robert Cross, and Capt. Faith were present for an interview of informant Bray regarding Lee.[2]  (Doc. 93-9). Capt. Faith monitored and recorded a series of phone calls between Mr. Bray and Albert Lee at the same phone number used in the previous two transactions. This number had been identified as belonging to Albert Lee. (Doc. 67-1, ¶11). Mr. Bray ordered a quantity of crack and arranged to meet Mr. Lee at the Sturges Avenue residence. (Doc. 93-8). Mr. Bray and his vehicle were searched, and he was provided with buy money and outfitted with a wire. Investigators followed Mr. Bray to the Sturges residence. According to the DEA-6 report, TFO Ansari, Special Agent Lucas, and Sgt. Mayer observed Albert Lee arrive in an orange and white Cutlass, although all three now deny having made the identification. However, it is undisputed that the Cutlass was registered to Albert Lee. (Docs. 93-8; 67-2, ¶11). Sgt. Mayer operated a video camera and provided surveillance. (Doc. 67-2, ¶11). TFO Ansari provided surveillance as well. (Doc. 94-1, ¶6).  Mr. Bray purchased a quantity of crack cocaine and later identified Albert Lee as the seller. (Doc. 93-8). Following the transaction, Mr. Bray and his vehicle were searched with negative results for drugs or money. (Doc. 93-8).

The fourth buy took place on 20 September 2005. The details are murky, to say the least, and none of the parties are exactly forthcoming as to what happened that day.

---

[2]     Special Agent Robert Cross maintains that the DEA-6 report is incorrect, in that he was not present for the 15 September 2005 interview of Jerrell Bray.

Most of the defendants seemed to have believed, and still maintain (for the purposes of

this suit, anyway), that the controlled buy on that date involved Dwayne Nabors, the first

named defendant in United States v. Nabors.[3]  Further, the DEA's investigative report

indicates that Bray, with $10,000 of buy money in hand, arranged and carried out a

two-part controlled buy with Nabors. (Doc. 93-9).  The report explains that Bray met with

an individual purported to be Nabors, who provided a smaller quantity of drugs than was

originally agreed upon, which precipitated a second deal in which Nabors made up for

the shortfall. As it turned out, however, it appears Nabors was not the individual who

sold drugs that day, as far as the Court can discern. Instead, it seems Bray had

convinced officers that Nabors was the seller, when in fact he was using the plaintiff

Albert Lee as a stand-in. At a proffer meeting following his indictment, Albert Lee

admitted that he was the one who sold Bray drugs on 20 September 2005. And in his

responsive brief, Albert Lee admits that he was a stand-in for Nabors in the transaction,

by citing Bray's testimony from Lee Lucas's trial. Bray, when asked if he had "concerns

[that] if any of your surveillance people were to see you meeting Albert Lee instead of

------

[3]     In his affidavit, Lee Lucas maintains that the 20 September drug deal
        involved Albert Lee, while the DEA-6 report, which Lee Lucas prepared,
        indicates that Dwayne Nabors was the primary target and that Albert Lee
        played some role in the second part of the transaction. (Doc. 93-2). Matt
        Mayer and Larry Faith both state that the controlled buy involved a
        purchase of drugs from Dwayne Nabors, without any mention of Albert
        Lee. (Docs. 67-1, ¶12; 67-2, ¶12). The affidavit of Thomas J. Verhiley
        likewise suggests that Bray purchased drugs from Dwayne Nabors. (Doc.
        91-1, ¶¶12-26). While Jamal Ansaari was the undercover agent
        accompanying Bray during the 20 September purchase, he makes no
        claim as to the identity of the seller. (Doc. 94-1, ¶7).

Dwayne Nabors, that you might get caught," answered no, "because [he] had got away with it a few times." (Tr. 242).

*Background on Bray's Reliability and the Investigative Practices of Operation Turnaround*

In opposing summary judgment, the plaintiff cites numerous instances calling into question Bray's reliability and whether the defendants had probable cause to arrest and prosecute him. Early in the investigation, before Mr. Lee became a target, Dawn Brown, an officer with the METRICH unit, a specialized drug enforcement branch of the RCSO, became concerned with Bray. Ms. Brown stated that Mr. Bray was being handled in a way "that was contrary to the way [she] was trained." (Tr. 1533). METRICH declined to use Mr. Bray as an informant because it determined he was too difficult to control. (Tr. 3197). By March 2005, there was evidence that Mr. Bray had lied about the identity of one Operation Turnaround target, Jason Westerfield, who was later charged in the Nabors case. At the time of Westerfield's identification by Bray, Westerfield was wearing an unremovable GPS tracking device which demonstrated that he was not present at the location Mr. Bray claimed he was. (Doc. 100-2). The plaintiff provides an investigative report with respect to the incident in question indicating that Det. Metcalf "could see a visual on [Bray] and Westerfield," which Lee contends shows that Metcalf -- or Mayer, who wrote the report -- lied in order to corroborate Mr. Bray's false identification.

Mr. Bray's testimony from the Lucas trial indicates that Mr. Bray's girlfriend informed the RCSO that he had crack cocaine hidden under the faceplate of the steering wheel of his car.  (Tr. 371-74). Bray was arrested as a result, but the charges

were ultimately dropped, purportedly through the intervention of Det. Metcalf. (Tr. 372-73). Capt. Faith knew that the drugs had been found in Mr. Bray's car but allowed Det. Metcalf and Sgt. Mayer to continue to use Mr. Bray to set up controlled drug sales. (Tr. 2882-83).

When the DEA joined Operation Turnaround, Bray was presented to the DEA as the "best informant [the RCSO] ever had." (Tr. 3196-97). RCSO officers did not express any concerns about his reliability. (Tr. 3197). The joint investigation conducted controlled buys on the 6th and 9th of September. In those buys, Mr. Bray used a stand-in named Darren Transou to impersonate two targets, Noel Mott and Lowestco Ballard.  (Tr. 170-71, 184). Lee Lucas testified that he looked at a picture of Transou to rule him out before identifying Ballard. The plaintiff maintains this was a lie because Special Agent Cross did not order an identification picture of Transou for more than a year after Lucas's identification. (Tr. 688-92, 790, 3322).

On 15 September 2005, the same day that Mr. Bray engaged the plaintiff in a controlled transaction, Mr. Bray was given $2,400 for a controlled drug sale targeting Noel Mott. However, Bray met with Transou instead, and he paid him $1,620.  Mr. Bray hid the remainder of the money behind his car radio, with the intent, according to the plaintiff, of stealing it. (Tr. 210-14, 3062-68). After the buy, defendants Verhiley and Ansari searched Mr. Bray's car and discovered the money.  (Tr. 213). Plaintiff indicates that an audio recording of the incident reveals that Special Agent Lucas and Capt. Faith were present when the vehicle was searched, but Lucas's report did not disclose that the money had been hidden. Instead, the report suggested that the money was returned before the vehicle was searched. (Doc. 100-4, p. 2).

As noted above, on 20 September 2005, Bray used the plaintiff Albert Lee as a stand-in for Dwayne Nabors. During that transaction, Bray apparently stole thousands of dollars from the DEA, by using part of the $10,000 in buy money to purchase an Oldsmobile Cutlass from Mr. Lee. (Tr. 236).

During a controlled transaction on 5 October 2005, Bray purportedly bought drugs from Roosevelt Williams. One of the surveillance officers, Detective Walker, was familiar with Williams from prior investigations, and he knew him to be tall, thin, and light skinned with freckles. (Tr. 2086, 2091). The person Bray identified as Williams was short, dark-skinned, and stocky. (Tr. 2091). The plaintiff states that Det. Walker informed Lee Lucas that the suspect had been misidentified. Lucas's report on the transaction did not mention Det. Walker's observation. (Tr. 1838-39).

According to Bray's testimony, on 14 October 2005, Bray recruited Jeremiah Conrad as a stand-in for Joshawa Webb, despite a glaring height difference between the two men. (Tr. 2220-28, 2232-33). Lee Lucas met Conrad and Bray in Bray's car and made a drug purchase. During Webb's arrest and prosecution, Lucas never revealed that the man being prosecuted was not the same man from whom he had purchased drugs in the car.

### Albert Lee's Indictment, Proffer, and Guilty Plea

On 9 November 2005, Albert Lee was charged with violations of the federal criminal drug laws in nine counts of a 51 count indictment returned in United States v. Dwayne Nabors, Case No. 1:05-cr-0537 (N.D. Ohio). Twenty individuals, including Lee, were charged. Around that time, a search warrant was obtained and executed for Mr.

9

Lee's residence at 161 Sturges Avenue in Mansfield, Ohio. A superseding indictment

followed on 15 March 2006 again charging Mr. Lee with drug violations in 9 counts. The

superseding indictment charged Mr. Lee as follows:

> Count 1 - having conspired, from the Winter of 2004 to November 8, 2005, to possess with intent to distribute, and to distribute, 50 grams or more of a mixture or substance containing a detectable amount of cocaine base (crack), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A);

> Count 14 - having knowingly and intentionally distributed five grams or more of a mixture or substance containing a detectable amount of cocaine base (crack) on August 1, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C § 2;

> Count 18 - having knowingly and intentionally distributed five grams or more of a mixture or substance containing a detectable amount of cocaine base (crack) on September 15, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) and 18 U.S.C § 2;

> Count 25 -- having knowingly and intentionally distributed fifty grams or more of a mixture or substance containing a detectable amount of cocaine base (crack) on September 15, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C § 2;

> Count 34 -- having knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base (crack) on July 25, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C);

> Count 35 -- having knowingly and intentionally distributed a mixture or substance containing a detectable amount of cocaine base (crack) on September 20, 2005 in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C § 2;

> Count 46 - did distribute a mixture or substance containing a detectable amount of cocaine base (crack) within 1,000 feet of Hedges Elementary on July 25, 2005 in violation of 21 U.S.C. § 860 and 18 U.S.C. § 2;

> Count 47 - did distribute a mixture or substance containing a detectable amount of cocaine base (crack) within 1000 feet of Hedges Elementary on August 1, 2005 in violation of 21 U.S.C. § 860 and 18 U.S.C. § 2; and

> Count 50 -- did distribute a mixture or substance containing a detectable amount of cocaine base (crack) within 1000 feet of Hedges Elementary on September 15, 2005 in violation of 21 U.S.C. § 860 and 18 U.S.C. § 2.

United States v. Nabors, Case No. 1:05-cr-0537 (N.D. Ohio).

On 10 November 2005, a warrant for the arrest of Mr. Lee was signed by United States Magistrate Judge Nancy A. Vecchiarelli in the Nabors case. Mr. Lee was arrested on 18 May 2006 in Flint, Michigan, and he was returned to Ohio. Mr. Lee was arraigned before Judge Adams on 29 June 2006, and he waived his right to a detention hearing and consented to being held without bond.

On 7 July 2006, Mr. Lee and his lawyer met with Assistant United States Attorney Blas Serrano, for the purpose of making a proffer. At the meeting, Lee admitted that (1) he started selling crack cocaine in Mansfield, Ohio in 2003; (2) on 20 September 2005, he met with Jerrell Bray for the purpose of selling $10,000 worth of crack cocaine; (3) he did not have enough crack cocaine to complete the deal but went to his drug supplier to obtain the crack needed; (4) he sent a drug courier to deliver the first installment of the crack cocaine to Bray and to collect the $10,000; (5) he turned over the $10,000 received from Bray to his drug supplier; (6) he and his drug supplier drove to Columbus, Ohio to obtain the crack cocaine necessary to complete the drug deal; and (7) he received a Buick Regal from his drug supplier for his role in the deal. (Doc. 91-1, ¶46).

On 16 October 2006, pursuant to plea agreement, Mr. Lee pled guilty to the conspiracy charge asserted in Count 1 of the superseding indictment. On 9 January 2007, Mr. Lee was sentenced to 120 months incarceration and eight years of supervised release. The eight remaining counts were dismissed. On 16 January 2007, Mr. Lee filed an appeal to the Sixth Circuit, challenging his sentence, and on 11 December 2007, Lee filed a § 2255 motion to vacate his conviction and sentence.

11

*Mr. Lee's Conviction and Sentence are Vacated*

On 20 December 2007, Jerrell Bray, the informant in the Nabors case, pled guilty to two counts of perjury and five counts of deprivation of civil rights with respect to his role in the investigation and prosecution of several defendants in the Nabors case, not including Mr. Lee. On 23 January 2008, the United States filed a motion requesting that the court vacate Mr. Lee's guilty plea and dismiss all charges against him.  The government sought an order to vacate because Jerrell Bray was an essential witness with respect to the charges to which Mr. Lee pled guilty. Further, even though Mr. Lee had pled guilty, the government concluded that Bray's illegal conduct was so pervasive and his credibility so tainted by his guilty plea that Mr. Lee should be permitted to withdraw his plea. And, even though Mr. Lee admitted his involvement in the distribution of crack cocaine in the Mansfield area, the government concluded that the interests of justice and fundamental fairness demanded that the charges against Mr. Lee be dismissed, in light of the pervasiveness of Bray's illegal conduct. On 6 February 2008, Judge Adams permitted Mr Lee's guilty plea to be withdrawn and his conviction and sentence vacated.

*Special Agent Lucas's Criminal Case*

On 12 May 2009, Agent Lucas was charged with violating 18 U.S.C. §§ 1503(a) (Obstruction of Justice), 1001(a)(3)(Knowing Creation of a False Government Document), 1623(a) (False Testimony and/or creation of a false material declaration), and 242 (deprivation of rights under color of law), in connection with his conduct in Operation Turnaround.  United States v. Lucas, 1:09-cr-0222 (N.D. Ohio).  On 5

February 2012, after a five week jury trial, Special Agent Lucas was acquitted of all charges.

*The Plaintiff's Claims*

Only a few weeks after testifying that he had participated in the illegal activity for which he was ultimately convicted, Lee filed this suit alleging that he was "charged, prosecuted, and incarcerated for over two years for crimes he did not commit." (Doc. 1, ¶1). Mr. Lee complained that "[i]n order to build a false case against [him], the Defendants knowingly fabricated evidence developed by Mr. Bray, otherwise fabricated evidence that falsely implicated [him], and destroyed and/or otherwise withheld from prosecutors and from [him] evidence that would have helped exonerate him." (Doc. 1, ¶17).

The named defendants included DEA Special Agents Lee Lucas and Robert Cross, DEA Task Force Officers Jamaal Ansari and Thomas Verhiley, the City of Cleveland, Richland County, and three law enforcement officers from the Richland County Sheriff's Office - Det. Chuck Metcalf, Sgt. Matt Mayer, and Capt. Larry Faith. Mr. Lee alleged constitutional claims under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, including conspiracies to commit these constitutional violations. Mr. Lee also asserted state law claims of malicious prosecution, false imprisonment and arrest, intentional infliction of emotional distress, and conspiracy against the individual defendants. Mr. Lee further alleged state law "failure to train" claims against the City of Cleveland and Richland County. (Doc. 1).

13

Each of the defendants filed a motion to dismiss. On 31 October 2011, the Court granted in part and denied in part the defendants' motions, ruling that the City of Cleveland and Richland County were entitled to statutory immunity with respect to the plaintiff's "failure to train" state law claim; that the plaintiff's constitutional claims under the Fourth Amendment for false imprisonment/false arrest and related conspiracy claims were time-barred; that the plaintiff's state law claims for malicious prosecution, false imprisonment and arrest, intentional infliction of emotional distress, and conspiracy were time-barred. (Doc. 49). The Court rejected the defendants' arguments that the plaintiff's claims were barred by the doctrine of judicial estoppel. Surviving the motions were plaintiff's claims for malicious prosecution and unlawful detention under the Fourth Amendment, due process under the Fifth and Fourteenth Amendments, and corresponding conspiracy claims. Id.

*Motions for Summary Judgment*

Each defendant thereafter filed a motion for summary judgment based on qualified immunity. After the motions were fully briefed, the Court allowed the plaintiff to propound 20 interrogatories to each individual defendant limited to the issue of qualified immunity. The individual defendants were ordered to renew their motions upon completion of the additional discovery.

Now before the Court are renewed motions for summary judgment filed by each of the individual defendants. (Docs. 88, 90, 91, 93, 94, 95). The plaintiff Albert Lee has filed a consolidated response. (Doc. 99). All individual defendants except Jamal Ansaari have replied. (Docs. 103, 104, 106, 108, 109).

14

## II. Standards

### A. Rule 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All inferences must be construed in a light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).

### B. Qualified Immunity

The doctrine of qualified immunity is "available to government officials performing discretionary functions." Painter v. Robertson, 185 F.3d 557, 566 (6th Cir.1999). The doctrine provides "immunity from suit rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-201 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223(2009). Because qualified immunity is "an entitlement not to

15

stand trial or face the other burdens of litigation," the issue should be addressed "early in the proceedings." Id.

In determining whether qualified immunity is available, a court must make an initial inquiry of whether, "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged show the officer's conduct violated a constitutional right." Id. at 201. If no constitutional right has been violated, there is no need for the court to inquire further, as the officer will be entitled to immunity. Id.

If, however, the facts could show a constitutional violation, a court must then determine whether the right was clearly established at the time of the officer's conduct. Id. A government official will be entitled to immunity from suit as long as his conduct does not violate "clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." Painter, 185 F.3d at 567. Any action which is "objectively reasonable" in light of the "clearly established law at the time of the conduct at issue" will be protected by qualified immunity. Id. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

### III. Law and Argument

#### A. Malicious Prosecution

The burden is on the plaintiff to show that the defendants are not entitled to qualified immunity. Miller v. Administrative Office of Courts, 448 F.3d 887, 894 (6th Cir. 2006). In order to prove malicious prosecution, a plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant "ma[d]e,

16

influence[d], or participate[d] in the decision to prosecute." Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir.2007). Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Id. at 237. Third, the plaintiff must show that, "as a consequence of a legal proceeding," the plaintiff suffered a "deprivation of liberty," as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Johnson v. Knorr, 477 F.3d 75, 81 (3d Cir.2007). Fourth, the criminal proceeding must have been resolved in the plaintiff's favor. Heck, 512 U.S. at 484.

In this instance, there is no dispute that the plaintiff suffered a "deprivation of liberty" and that criminal proceedings were ultimately resolved in his favor. Further, because the Court will ultimately conclude that probable cause existed in this instance, it need not address the parties' arguments as to which defendants "made, influenced, or participated in the decision to prosecute. The malicious prosecution claim will therefore be decided on the question of probable cause alone.

*Probable Cause*

The defendants direct the Court's attention to evidence that Albert was in fact involved in illegal drug trafficking during the time period in question, and had admitted as much. To be sure, plaintiff Lee did provide the government with a proffer, admitting that he sold drugs on 20 September 2005, and he pled guilty to a drug conspiracy charge. In addition, even now Lee concedes that he sold drugs on 20 September 2005 by relying on Jerrell Bray's testimony from the Lee Lucas trial, which indicates that Albert Lee himself was used as a stand-in for another target of the investigation.

17

However, the fact that Lee may have actually committed the crimes for which he was charged does not answer the probable cause question nor does it foreclose his constitutional claims. As Lee correctly points out, the plaintiff's factual innocence is not an element of a malicious prosecution claim. See United States v. McNeal, 955 F.2d 1067, 1078 (6th Cir. 1992). Further, while Mr. Lee's proffer admitting his involvement in the drug sales unquestionably provided probable cause to prosecute from that day forward, cause does not apply retroactively. See Peet v. City of Detroit, 502 F.3d 557, 571 (6th Cir. 2007).

The question before the Court is whether Mr. Lee can avoid summary judgment on his claims of malicious prosecution and unlawful detention, by demonstrating a factual dispute as to whether at the time of his arrest investigators had probable cause to believe that he had committed the crimes with which he was charged. For the reasons that follow, the Court concludes that the material facts are not in dispute and probable cause supported the indictment.

First, the finding of an "indictment, fair upon its face, by a properly constituted grand jury conclusively determines the existence of probable cause." Barnes v. Wright, 449 F. 3d 709, 716 (6th Cir. 2006). There is an exception to this rule when the grand jury indictment was obtained by an officer's false testimony.  See Hinchman v. Moore, 312 F.3d 198, 205-06 (6th Cir. 2002). To invoke the exception, a plaintiff must prove that a law enforcement official "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create[d] a falsehood" and "such statements were material, or necessary, to the finding of probable cause." Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010). In this instance, the plaintiff maintains that

18

probable cause was lacking because the grand jury's finding of probable cause relied upon fabricated inculpatory evidence and the defendants' deliberate concealment of key evidence impeaching Mr. Bray.

The Court first rejects the notion that the grand jury relied on "fabricated inculpatory evidence," since the plaintiff is unable to specifically address any such evidence that would have materially affected the grand jury's decision. Further, the plaintiff does not establish that the defendants were required to disclose to the grand jury evidence that may have impeached Bray's credibility. In the Sixth Circuit, "[a] federal prosecutor is not obligated to present exculpatory evidence to the grand jury." United States v. Adamo, 742 F.2d 927, 937 (6th Cir. 1984). "The function of the grand jury is investigative. Its proceedings are not adversarial in nature, but rather consist of inquiries conducted by laymen without resort to the technicalities of trial procedure." United States v. Ruyle, 524 F.2d 1133, 1135 (6th Cir. 1975). Where an indictment is fair on its face, a defendant is "not entitled to challenge it on the ground that information he considered favorable to his defense was not presented to the grand jury." Id. at 1136. Therefore, the defendants were not obligated to present facts relating to Bray's credibility to the grand jury.

Further, even if such disclosure were required, it is the Court's view that probable cause still supported the indictment. In making a probable cause determination, the Court considers the totality of the circumstances, examining "all facts and circumstances within an officer's knowledge at the time of an arrest." Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir.1999); Gates v. Illinois, 462 U.S. 213 (1983). Where, as here, an informant's tip is part of the equation, the informant's reliability,

19

veracity, and basis of knowledge are relevant factors to consider. <u>Gates</u>, 462 U.S. at

271. None of these factors is a necessary condition to a finding of probable cause.

Rather, "a deficiency in one may be compensated for, in determining the overall

reliability of a tip, by a strong showing as to the other, or by some other indicia of

reliability."  <u>Id.</u> Therefore, as explained in <u>Gates</u>, the tip of an anonymous informant of

unknown reliability or veracity can form the basis for probable cause, as long as the tip

has been substantially corroborated by law enforcement. <u>Id.</u> Even an informant who has

proved unreliable in the past can provide a reliable tip, if adequately substantiated.

<u>United States v. Bryant</u>, 2005 WL 1312473 (6th Cir. 13 May 2005); <u>see also United</u>

<u>States v. Patayan Soriano</u>, 361 F.3d 494, 506-07 (9th Cir. 2004) ("information from

dishonest informants may still provide a basis for probable cause.").

  In this instance, the Court agrees with the plaintiff that there is a fact issue as

whether Bray was a reliable informant. As discussed above, the plaintiff describes a

pattern of deceit on the part of informant Bray, which the defendants allegedly covered

up.  Mr. Lee presents evidence that while operating as an informant for the RCSO, Bray

misidentified one target and possessed crack cocaine in violation of the informant's

agreement. After the DEA joined the investigation, Bray continued to misidentify targets.

He apparently bought an Oldsmobile with government funds and attempted to steal buy

money by hiding it behind his car radio. In the Court's view, this evidence, if accepted by

a jury, would allow for the finding that Bray was untrustworthy. However, there is also a

factual dispute as to whether and which of the defendants knew of Bray's

transgressions. Bray himself testified that he acted alone in his use of stand-ins, and the

defendants continue to maintain their belief at that time that Bray was reliable.

20

The probable cause question, therefore, depends on whether law enforcement adequately corroborated Bray's story. The defendants maintain they did because (1) Bray identified Lee as the individual who sold him crack cocaine on multiple occasions; (2) law enforcement independently observed Lee's presence at the drug deals; (3) Lee had prior criminal drug convictions; (4) tape recordings with Lee's voice setting up, and engaging in, the drug deals with Bray; (5) vehicles registered to Lee were observed by law enforcement at the drug deals; (6) searches of Bray prior to the buys with Lee confirmed that Bray did not have drugs or money; (7) Officers copied the serial numbers of the buy money used in the drug deals; (8) Bray was debriefed by officers immediately following the controlled deals, at which time the officers recovered the drugs.

These facts are largely undisputed, with the plaintiff taking issue only with the factual claim that law enforcement independently observed Lee's presence during the drug deals. The plaintiff states that every defendant who purportedly identified Mr. Lee during the drug transactions now denies having made such an identification. Specifically, Ansari and Mayer now both disclaim having identified Lee, although the investigative reports indicate otherwise. While the investigative report shows that Special Agent Lucas identified Mr. Lee during the September 15th buy, Lee Lucas now does not state one way or the other whether he in fact identified Lee at that time. Further, in his reply, Lucas claims that Richland County officers were able to compare Lee's arrest photo with video surveillance, but none of the officers who took surveillance admit to having identified Lee. In the Court's view, the facts are in dispute as to whether Lee was independently identified by any of the investigators. Therefore, because the Court must view disputed facts in favor of the non-moving party on summary judgment,

21

it is assumed for the purposes of the motion that Lee was not independently identified by the officers.

Notwithstanding these disputed issues of fact, it is the Court's view that the facts that are undisputed provided probable cause to believe that Lee sold drugs to Bray as stated in the indictment. While probable cause was not overwhelming, as the defendants suggest, it was sufficient. First, the transactions in this instance were all controlled buys. In United States v. Coffee, 434 F.3d 887, 894 (6th Cir. 2006), a panel of the Sixth Circuit concluded that a tip of an informant of unknown reliability was adequately corroborated, where "the purchase was controlled and witnessed by [law enforcement], who searched the CI for money or contraband, provided the CI with pre-recorded funds, observed the CI enter and exit defendant's house, and then observed and tested the crack cocaine the CI purchased from defendant."  Based on the undisputed facts of the present case, the corroborative steps taken by law enforcement were at least as rigorous as those in Coffee.

In this instance, each buy was preceded by a monitored and recorded telephone call in which Bray arranged a deal. Similar to Coffee, officers searched the informant and his vehicle, and they provided him cash whose serial numbers had been recorded. Each transaction occurred at Lee's residence on Sturges Avenue. As in Coffee, the informant wore a wire, and officers monitored the transaction and surveilled the informant to and from the site of the buy.  After the transaction, officers met Bray at a prearranged location for debriefing. Bray handed over the drugs, and he and his vehicle were searched. It is undisputed that Bray identified Lee as the one who sold him drugs on 25 July 2005, 1 August 2005, and 15 September 2005.

22

Even if a reasonable officer still doubted Bray's tips based on his apparent credibility problem, other undisputed facts adequately corroborate the information. For instance, officers observed vehicles registered to Albert Lee at the locations where the drug transactions with Bray took place. Of course, this fact would not place Lee at the scene of the crime to a certainty, because, as the plaintiff observes, "the person who owns a vehicle is not always the person who drives it." However, probable cause does not require certainty, and the information that Lee sold Bray drugs in a series of controlled transactions unquestionably gains credibility where Lee's vehicle is independently observed at the time and place of the transactions. Moreover, in setting up the deals, there is no dispute that Bray contacted Lee repeatedly at a phone number associated with Lee. Probable cause was further bolstered by officers' undisputed knowledge that Lee has a criminal record, which includes a prior drug convictions. See United States v. Dyer, 580 F.3d 386, 392 (6th Cir. 2009) ("Although a defendant's criminal history is not dispositive, it is relevant to the probable cause inquiry").

The defendants also contend that the fact that Mr. Bray identified Lee on multiple occasions supports probable cause. Mr. Lee disputes this conclusion and argues that because the identifications rely solely on Bray's questionable credibility, they do nothing to bolster the reliability of the tip. The Court agrees with Lee to the degree that Bray's multiple identifications of Lee do not, when viewed in isolation, bolster Bray's credibility. If law enforcement had a reason to believe, in light of Bray's past deceit, that one tip was unreliable, another similar tip would not necessarily make his story any more believable. However, in this instance, where law enforcement made corroborative

23

efforts each step of the way, the fact that Bray made multiple identifications supports the finding of probable cause.

Further, as for the 20 September 2005 controlled buy, it seems Albert Lee would have the Court believe that Bray set him up as a stand-in for Dwayne Nabors, which, interestingly, highlights the fact that Mr. Lee was in fact a participant in the drug deal. Although this fact also highlights Bray's questionable credibility, Lee does not explain how the incident somehow diminishes the degree of probable cause as to him. And, hypothetically, if law enforcement knew that Albert Lee was a stand-in for Nabors, as Lee seems to suggest, it would seem that, if anything, probable cause as to Lee would be enhanced, despite the clear wrong-doing on the part of law enforcement as to Nabors. In any event, the Court need not untangle the facts relating to the 20 September 2005 deal, because the plaintiff fails to provide any meaningful argument as to how the facts of this incident are favorable to him.

In light of the totality of the circumstances, and in spite of any knowledge of Bray's unreliability that the defendants may have had, the undisputed facts demonstrate that law enforcement adequately corroborated Bray's tips such that probable cause existed to support the indictment.

**B. Fabrication of Evidence**

The plaintiff maintains that the defendants fabricated evidence that he was present during the controlled buy that took place on 15 September 2005. He indicates that Lee Lucas's investigative report states that Ansari, Lucas, and Mayer "observed Albert Lee arrive driving an orange and white Cutlass." (DEA-6, Sept 15., ¶5). Lee

24

maintains this was a fabrication because all three officers now disclaim having identified him on 15 September 2005.

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." Gregory v. City of Louisville, 444 F.3d 725, 737 (6th Cir. 2006) (citing Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir.1997)). Assuming for the sake of argument that Lee could prove that Lucas knowingly included the above-mentioned fabrication in his report, Lee fails to demonstrate that the fabrication is material to the probable cause question. As discussed in the previous section, law enforcement adequately corroborated Bray's tip by conducting controlled purchases, observing Lee's vehicles at the location of the transaction, and running a background check on Lee, among other things. Independent identification of Lee by law enforcement was not necessary to the finding of probable cause. As a consequence, there is no reasonable likelihood that the alleged fabrication would have affected the grand jury's probable cause determination.

### C. Unlawful Detention

In order to succeed on a federal constitutional claim of unlawful detention, a plaintiff must show that he was detained without legal process. This requires a plaintiff to prove that the arresting officer lack probable cause to arrest the plaintiff. See Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005). As described above, law enforcement officers had sufficient probable cause to arrest the plaintiff. As a consequence, the unlawful detention claim fails.

### D. The Plaintiff's Brady Claim

The plaintiff alleges that his Fifth Amendment rights were violated when the defendants failed to disclose impeachment evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. Evidence is material to guilt or punishment when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

In this instance, the plaintiff contends that Brady was violated, when the government failed to disclose that "Bray was stealing drugs and money from the DEA, framing innocent people, falsely relating his encounters with suspects, targeting personal enemies, and lying with abandon." (Doc. 99, p. 52). He also maintains that defendant Lucas "drafted false case reports and failed to report any of the exculpatory evidence he unearthed, often altering reports or transcripts to hide exonerating evidence." Lee maintains that Bray's misconduct and law enforcement's questionable investigative methods create a jury question as to whether the result "undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434.

The defendants contend, and the Court agrees, that this claim fails as a matter of law, in light of United States v. Ruiz, 536 U.S. 622 (2002), which holds that the Constitution does not require the government to disclose impeachment information prior

26

to entering into a plea agreement with a defendant or before a defendant pleads guilty. In Ruiz, the Supreme Court recognized that the Brady right to exculpatory impeachment information is part of the Constitution's basic "fair trial" guarantee. Id. at 628. Consequently, when a defendant chooses to forgo trial by entering a guilty plea, he waives his right to fair trial and, along with it, those rights that accompany it, including the right to impeachment information under Brady. Id. at 628-29. Ruiz rejected the proposition that impeachment information relates to the voluntariness of a guilty plea, as it is not the sort of

> critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not help a particular defendant. The degree of help that impeachment information can provide will depend upon the defendant's own independent knowledge of the prosecution's case – a matter that the Constitution does not require prosecutors to disclose.

Id. at 630. Ruiz further recognized that a defendant has no Constitutional right to "complete knowledge of the relevant circumstances," and that a court is permitted "to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor." Id. Ruiz further rejected the idea of a right to impeachment information prior to a defendant entering a guilty plea, on the grounds that the value of any such right to the defendant would be limited and burden on the government would be great. Id. at 631-32. Requiring such a disclosure "could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." Id. at 631.

27

The plaintiff argues that the non-disclosures in this instance are exculpatory in nature and that Ruiz should not apply because only impeachment information falls within its scope. The Court disagrees. First, the non-disclosures of which the plaintiff complains are not exculpatory in nature.  While he contends that Bray framed innocent people, targeted enemies, and lied, nowhere does the plaintiff provide evidence that he himself was framed, targeted, or lied about. Likewise, even accepting as true that Lee Lucas "drafted false case reports and failed to report any of the exculpatory evidence he unearthed," there is no explanation how this allegation applies to the plaintiff specifically. The non-disclosures plainly relate to the credibility of Bray and Lucas, not to Lee's innocence.

Further, courts generally do not distinguish between impeachment information and exculpatory information for Brady purposes. See Kyles, 514 U.S. at 433. However, if Ruiz provides any distinction at all between the two, that distinction, stated precisely, is between "impeachment information and exculpatory evidence of actual innocence," See McCann v. Mangialardi, 337 F.3d 782, 788 (7th Cir. 2003).  Therefore, if the plaintiff is to maintain a Brady claim in this instance, he must prove that the defendants had "knowledge of [his] factual innocence but fail[ed] to disclose such information to [him] before he enter[ed] into a guilty plea." Id. Mr. Lee has not provided a shred of evidence that he was actually innocent of the crimes for which he was indicted. Nor is there any evidence that the defendants knew him to be innocent. In fact, the evidence before the Court overwhelmingly suggests that Mr. Lee did sell drugs to Bray on a number of occasions.

28

The Court also rejects the plaintiff's argument that <u>Ruiz</u> should not apply here because "the case at bar is a civil case, not a criminal case."  The plaintiff seems to be suggesting, on the one hand, that the government is not constitutionally required in a criminal case to disclose impeachment information prior to a guilty plea, but that the government may, on the other hand, be held liable in a civil action for failing to make the same disclosure. The plaintiff provides no meaningful support for this unusual idea, and the Court rejects it.

The plaintiff's Brady claim accordingly fails as a matter of law.

**E. Conspiracy**

The plaintiff alleges a conspiracy to violate his constitutional rights. A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." <u>Revis v. Meldrum</u>, 489 F.3d 273, 290 (6th Cir.2007). To prevail on a civil conspiracy claim, a plaintiff must show that (1) a "single plan" existed, (2) the defendants "shared in the general conspiratorial objective" to deprive the plaintiff of his constitutional (or federal statutory) rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused injury" to the plaintiff. <u>Hooks v. Hooks</u>, 771 F.2d 935, 944 (6th Cir.1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." <u>Id.</u>

In this instance, the plaintiff has failed to demonstrate that his constitutional rights were violated. As discussed above, the plaintiff was arrested and prosecuted with probable cause, and his <u>Brady</u> claim fails as a matter of law. As a consequence, his conspiracy claims fail as well.

29

**F. Judicial Estoppel**

The defendants request that the Court reconsider its previous order rejecting the applicability of the doctrine of judicial estoppel in this instance. The request is denied.

**IV. Conclusion**

For the reasons stated above, the undisputed facts demonstrate that the plaintiff did not suffer constitutional injury and the defendants are entitled to qualified immunity. The defendants' motions are granted. (Resolving 88, 90, 91, 93, 94, 95).


IT IS SO ORDERED.

                                 /s/ Lesley Wells
                              UNITED STATES DISTRICT JUDGE

Date: 15 October 2013